LittletoN, Judge,
delivered the opinion of the court:
Plaintiff sues to recover $1,030,688.86, plus interest, which represents income and excess profits taxes and deficiency *462 interest paid for its fiscal years ended April 30,1943, through 1950, inclusive. There are two issues presented. The first and principal one is the reasonableness of compensation paid to plaintiff’s officers and key employees in accordance with its incentive compensation plan for each of the years involved. The other issue is whether $10,000 spent in the fiscal year 1948, in expediting the closing of a street through plaintiff’s property, should be allowed as an expense deduction or capitalized.
The plaintiff duly filed its returns and paid its taxes for the years here involved in the amounts set forth below.[1] The Commissioner of Internal Revenue disallowed part of plaintiff’s deductions and assessed, and plaintiff paid, the resulting deficiencies in tax, with interest. On January 28, 1953, plaintiff filed timely claims for refund in the amounts set forth below.[2] The Commissioner rejected the claims for refund and suit was timely instituted in this court.
The plaintiff is in the business of manufacturing, selling and distributing on a nationwide basis, distilled spirits,
*463 principally “Old Forester,” “Early Times,” and “King.” The plaintiff is a successor to the business of an earlier Kentucky corporation which, with its predecessor, had been engaged in the same business since 1870. During prohibition it operated on a reduced scale and sold “Old Forester” for medical use under one of eight such Federal permits issued. Upon repeal of the Eighteenth Amendment, effective December 5,1933, the Kentucky corporation was reorganized into the present Delaware corporation.
Selling whisky, which has been aged for several years, at premium prices, is plaintiff’s specialty in the industry. Shortly after prohibition there was a rush by all distillers to get back into production and in the early years plaintiff, in competition with other and some much larger companies, first sold three-months-old whisky, then a six-months-old product, nine-months and then a year-old product.
By 1936 or 1937, it became apparent to plaintiff that it could not, under its existing policy and management, profitably compete on a volume basis with the larger companies and that it was failing to accumulate the necessary inventory of aged quality whisky with which to demand premium prices. Accordingly, in 1938, plaintiff dismissed its then executive vice president and appointed a management executive committee to direct its operations. This committee consisted of Owsley Brown, its president, his two sons, Lyons and Garvin, and John Sanderlin. At that time plaintiff commenced to accumulate its whisky distillations until they had matured beyond four years of age, so it would be in a position to sell quality whisky at premium prices. This policy of accumulating the distillations resulted in a weak financial position until the sale of this aged whisky. Due to this condition relatively low salaries were paid plaintiff’s officers and key employees during this period.
During the latter part of 1941 and in 1942, a study was made for the purpose of evolving a plan for increased compensation for the officers and key employees. The plaintiff’s attorney recommended an incentive compensation plan providing for the payment of 10 percent of net profits to the officers and key employees and he considered this plan to be in line with incentive compensation paid by other companies. *464 A non-companj and non-family director of the plaintiff, who had had experience with incentive compensation plans, supported and advocated the proposed plan.
At the July 28, 1942, meeting of the board of directors a resolution was adopted fixing salaries for its then six officers, approving an incentive compensation plan, and fixing participating percentages for the officers and eight key employees. The plan adopted by this resolution was in effect from April 30,1943, through April 30,1946. Thereafter, by various resolutions, it was readopted with certain revisions reducing the percentage participation of the officers and providing for percentage participation of additional employees who were not officers. The incentive compensation and fixed salaries paid for each year in controversy were pursuant to contractual arrangements made before the services were rendered.
When the incentive compensation plan was adopted, Ows-ley Brown and his two sons and his brother, Robinson, together with their families, owned 51 percent of plaintiff’s voting stock. These four Browns were members of the board of directors, but they did not constitute a majority of the board, which consisted of nine members in each year.
The pertinent part of section 23 of the Internal Revenue Code of 1939, as amended, provides:
Deductions from Gross Income.
In computing net income there shall be allowed as deductions:
!a) Expenses.— 1) Trade or Business Expenses.— A) In General. — All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *
The pertinent part of Treasury Regulations 111 is set forth below.[3]
*465 Although the Commissioner of Internal Revenue disallowed deductions for part of the compensation of several of plaintiff’s officers and key employees, the defendant now only seriously contends that the compensation of Lyons and Garvin Brown was excessive. The commissioner of this court has found that the compensation paid to the officers and key employees here in dispute was reasonable and was, under the facts and circumstances shown by the record, an ordinary and necessary business expense and therefore deductible under section 23 of the Code. In our opinion the record amply supports this finding and we are in complete agreement with it. Inasmuch as the defendant does not now seriously contest the amounts paid those officers and key employees (aside from Lyons and Garvin Brown) and there are detailed findings on those individuals, no further discussion as to the reasonableness of their compensation is deemed necessary.
W. L. Lyons Brown, a son of Owsley Brown, served as secretary of plaintiff from 1933 to 1939, as vice president from 1939 to 1945, and was president thereafter during the years in question. During the company’s critical financial period commencing in 1938, he served on the management committee and in this capacity was responsible for adopting and carrying out plans which contributed to the phenomenal success of the company. He was born in 1906, had four years of college, and had had experience with a large brokerage firm as branch manager from 1928 to 1932. He also had experience as a cruise director in a travel business. He came with the plaintiff’s predecessor in 1933, and did some construction work. He was elected director and secretary of *466 plaintiff, and became the advertising director. He was elected vice president in 1939, and took on additional duties as sales manager for the company. The activities of regional offices in New York, Chicago, and San Francisco were under his supervision. During the period involved he was also chairman of the executive committee of the company.
As vice president he was director of the entire sales and advertising organizations. Both as vice president and president he was in charge of frequently held management conferences which formulated plaintiff’s over-all business policies. Under his supervision plaintiff’s net sales increased from approximately $11,200,000 in 1942, to $45,700,-000 in 1950. Advertising expenditures under his supervision increased from about $539,000 in 1942, to about $3,408,000 in 1950. The activities of approximately 100 to 125 men in the sales organization were under his supervision. After he became president he initiated and directed plaintiff’s policies, and had general supervision of all operations. He has a reputation as one of the top executives in the distillery industry and he devotes his entire time to the affairs of the business.
George Garvin Brown, a son of Owsley Brown, served as assistant secretary and purchasing agent, production manager, vice president in charge of production, and executive vice president of plaintiff between 1933 and 1950. He also was on the management committee during the critical financial period beginning in 1938 and was responsible for adopting and carrying out policies which contributed to the success of the company. He was born in 1912, and had a college education. He also had experience as a cruise director. He started with plaintiff in 1933 as a labor foreman. He was elected to the board of directors and assistant secretary, and also served as purchasing agent in that year. In 1984, he became production manager. He was elected vice president in 1938, and executive vice president in 1945. While production manager he was in complete charge of all production, including the manufacturing, warehousing and bottling of whisky, and the procurement of supplies. During the war plaintiff was in production, under Garvin’s supervision, on a 24-hour, 7-day week schedule, producing *467 alcohol for the Government. He was also in charge of construction work and cooperage in as many as 16 mills in several states. The number of employees under his supervision in the production work was from 500 to over 1,000. He was also senior officer in charge of labor relations for the company. He participated in the formulation of plaintiff’s over-all business policies and served on its executive committee. He has an excellent reputation as an executive in the distillery industry and he devoted his entire time to his employment with plaintiff.
The total annual compensation paid Garvin by plaintiff was the same as that paid Lyons, except for 1943, when Garvin received about $500 less than Lyons. The total compensation paid Lyons, in round numbers, was $49,750 for 1943; $82,700 for 1944; $100,600 for 1945; $113,800 for 1946; $160,800 for 1947; $141,700 for 1948; $118,800 for 1949; $106,700 for 1950. The amount received as incentive compensation ranged from two-thirds to three-quarters of the total amount paid for each year.
It is relevant to note that following the adoption of the incentive compensation plan plaintiff began to show a rapid growth. Net sales had increased from $11,200,000 in 1942, to $45,700,000 in 1950. Net profits before taxes, but after deducting all compensation payments, had increased from $668,000 in 1942, to $5,621,000 in 1950. Earnings on common stock had increased from 47 cents per share in 1942, to $4.64 per share in 1950. Plaintiff’s stock was actively traded on the American Stock Exchange and the market value of the stock increased by about 60 times from a low of about $1.25 per share. Dividends paid in 1942 amounted to $30,000, whereas by 1950 they had increased to $981,735. Total assets for 1942 were $9,135,000 and had increased to $41,805,000 by 1950. Working capital had increased from $2,490,000 in 1942, to $25,795,000 in 1950. Employees numbering 535 in 1942 had increased to 1,038 in 1950. There were also substantial increases in plaintiff’s capacity during this period.
The plaintiff made full disclosure of its compensation plan for Securities Exchange purposes, and its stockholders have never objected to the amounts paid as compensation. It *468 should be borne in mind that the Browns and their families only owned about 51 percent of the voting stock Also, plaintiff had outstanding indebtedness ranging from $3,884,-310 to $17,200,000 and none of the creditors has raised any objection to the amount paid as compensation. Plaintiff’s compensation plan met the salary stabilization requirements.
Every business, especially one as highly competitive as the business of the plaintiff is largely dependent upon the capacity, resourcefulness, and assiduity which its executive officers personally give to it, and incentive compensation is a prudent method of instilling additional enthusiasm in these leaders and is clearly recognized for tax purposes as long as the total compensation is reasonable. Gray & Co. v. United States, 68 C. Cls. 480, and the cases there cited.
The factors mentioned above indicate that the officers and key employees of plaintiff were top men in their field and were entitled to compensation commensurate therewith. What is the compensation commensurate with their respective abilities and the time they devoted to the business ? The board of directors thought the compensation paid was commensurate. None of the stockholders and creditors felt at any time that the compensation paid them was unreasonable. But better evidence of the reasonableness of the compensation paid is the compensation paid by other whisky businesses, comparable not only in volume of sales, but also in net profits. Also pertinent is opinion evidence, supported by facts, of qualified experts in the industry as to the reasonableness of the compensation paid.
A comparison with Glenmore Distilleries of Louisville, Kentucky, which was deemed by the defendant to be comparable, indicates that the sales were comparable and that the profits of plaintiff were higher in every year in dispute here, except for 1948. During this 8-year comparison period plaintiff’s profits, after deducting all compensation, exceeded those of Glenmore’s by about $14,000,000. A comparison of the compensation paid by the two companies indicates that for the earlier years in question plaintiff paid its officers almost twice as much as did Glenmore, which had a bonus plan, but for the later years the compensation of Glenmore *469 gradually increased and in 1950 the compensation paid by Glenmore to its officers was more than tbat paid by plaintiff. The president of Glenmore, who was a witness for the defendant, stated that the compensation paid by plaintiff was reasonable and that such a plan would have been beneficial to his company.
The argument of defendant that Lyons and Garvin Brown received their high position and compensation because they were members of the Brown family and not necessarily because of their abilities or the work they performed is without support in the record. Obviously, the fact that they were Browns had some effect on their obtaining their high positions, but that is of no moment. The question is whether the compensation paid to them was reasonable in the relation of their abilities and the work which they actually performed. On this record we find that it was. The record indicates that the competence and business skill of plaintiff’s officers and key employees were responsible for plaintiff’s phenomenal growth, success and top standing in the industry today. Much higher compensation has been paid for lesser results. See the cases cited in Gray & Co. v. United States, supra, and the cases following that decision.
We hold that the compensation incurred and paid by plaintiff to the officers and key employees involved in this action was reasonable and was an ordinary and necessary business expense and is deductible in full under section 23 of the Code.
The other issue in this case is whether the expenditures made by plaintiff in 1948, in connection Avith the closing of Howard Street, are expenses or capital expenditures. The plaintiff owned in fee both sides of the street and under Kentucky law owned the fee to the street. However, it had been permanently dedicated to the city of Louisville. The Board of Aldermen passed the necessary resolution permanently closing the street. The city attorney was then required to file suit to dispose of certain formalities. The city attorney thought that in addition to plaintiff certain other property owners should be made defendants. The plaintiff disagreed with this but in order to accomplish the immediate closing of the street it paid $7,500 to an attorney *470 representing tbe several parties. Plaintiff also paid $2,000 directly to one of tbe landowners. A fee of $500 was required to be paid tbe city attorney in connection with the closing of the street.
The sole question is whether this $10,000, or any part thereof, was paid in “acquisition” of property or in the “protection” of property. If it was paid in the acquisition of property it should be capitalized, but if paid in the protection of an existing property right it should be deducted as an expense. Bliss v. Commissioner, 57 F. 2d 984, 986; Reakirt v. Commissioner, 29 B. T. A. 1296, affirmed per curiam, 84 F. 2d 996. Cf. Kornhauser v. United States, 276 U. S. 145; Welch v. Helvering, 290 U. S. 111; Commissioner v. Heininger, 320 U. S. 467. On this record we are of the opinion that the sum of $10,000 paid by plaintiff in the circumstances was a deductible expense. The $500 paid the city was nothing more than a nominal fee necessary to be paid to the city as an expense incident to the closing of the street. This expenditure was incurred and paid by plaintiff as a necessary expense for the permanent protection of its property under the resolution of the Board of Aldermen of the city, closing the street.
The resolution of the Board of Aldermen gave plaintiff all the title and interest that it could obtain to this property. The payment of $9,500 by plaintiff added not one cent of value to the property. The record shows that the parties to whom the $9,500 was paid not only had no right to prevent plaintiff from retaining its right to the permanent exclusive use of the closed street, but in fact, had no right to be paid anything by reason of the street closing. By the payment of the sum of $9,500 plaintiff received nothing but time, i. e., the immediate exclusive use of the property as opposed to the time required to get all the parties before the court for the formal suit and avoid the time and trouble of litigation. The expenditure of this sum was more in the nature of a short-term expense rather than a capital expenditure that added value to plaintiff’s existing property rights.
We therefore conclude that the sum of $10,000 which plaintiff paid should, under all the facts and circumstances, be deducted as an ordinary and necessary business expense.
*471 Judgment is suspended pending the filing of a stipulation by the parties showing the amount due in accordance with this opinion.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and JONES, Chief Judge, concur.
EINDINGS OP PACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Marion T. Bennett, makes the following findings of fact:
1. The plaintiff, Brown-Forman Distillers Corporation, was organized under the laws of the State of Delaware in 1938. Its principal place of business is at Louisville, Kentucky, and consists of the manufacture, purchase, storage, warehousing, and distribution of distilled spirits, principally premium brands of bourbon whisky. Plaintiff keeps its books and files its Federal tax returns on the accrual basis of accounting and on a fiscal year basis ending April -30.
2. Within the time required by law, plaintiff filed with the collector of internal revenue for the district of Kentucky its corporation income tax returns and its declared value excess profits tax and excess profits tax returns, for the years so required by law, disclosing the following total amounts of taxes due for each of the years indicated:

The above amounts were either credited or duly paid to the collector on or before the statutory installment dates which were fixed by law.
3.Subsequently, as the result of various adjustments made by the Commissioner of Internal Kevenue, the Commissioner *472 assessed and plaintiff has paid the following amounts of deficiencies in taxes and deficiency interest for the years indicated:

4. Under date of January 28, 1958, and within the time required by law, plaintiff filed claims with the Director of Internal Revenue for refund of income, declared value excess profits, excess profits taxes and deficiency interest with respect thereto, including a claim for statutory interest, for the fiscal years ended April 30, 1943 to 1950, inclusive, in the following amounts:

5. The basis of the above claims was that plaintiff asserted that in arriving at the tax liabilities for the above fiscal years the Commissioner had erroneously disallowed part of the compensation paid to officers and certain hey employees for personal services actually rendered, all of which plaintiff asserted was reasonable in amount within the mean *473 ing of section 23 (a) (1) (A) of the Internal Revenue Code. With respect to the fiscal year ended April 30, 1948, only, the plaintiff asserted that the Commissioner, in determining plaintiff’s income tax liability for the year, had also erroneously disallowed as a deduction the amount of $10,000 which plaintiff asserted represented payments made to certain individuals in connection with the closing of Howard Street adjacent to plaintiff’s plant in Louisville, and plaintiff further asserted that the amount is properly allowable as a deduction under Section 23 of the Internal Revenue Code.
6. The Commissioner of Internal Revenue, by registered letters under date of March 5, 1953, rejected the aforesaid claims for refund for the fiscal years 1943 to 1950, inclusive.
7. Plaintiff specializes in the manufacture, sale and distribution on a nationwide basis of bourbon whisky bottled in bond under the brand name “Old Forester.” Whisky bottled in bond is required to be aged for at least four years and to be “100 proof,” which is a standard for measuring its concentration of alcoholic content. In order to have a sufficient line of various grades of whiskies to support distributorships on a nationwide basis, plaintiff also produces and markets whiskies and blends thereof under several other brand names. Plaintiff’s top selling brand of straight whisky was sold under the ¡brand “Early Times” and its principal blended whisky was sold under the brand name of “King.”
8. Plaintiff’s business is a successor to the business of Brown-Forman Distillery Company, a Kentucky corporation, which, prior to the adoption of the Eighteenth Amendment to the Constitution of the United States and during prohibition, had, with its predecessor, been engaged in the same business since 1870. During prohibition the Kentucky corporation had continued on a greatly reduced scale to manufacture “Old Forester” for medical use under one of the eight permits issued in the United States for that purpose.
9. The Eighteenth Amendment was repealed by the enactment of the Twenty-first Amendment to the Constitution of the United States, effective December 5, 1933. When, in 1933, it became apparent that this would happen, the old Kentucky company was reorganized into the present Delaware corporation. Mr. Owsley Brown and his family, who *474 had owned all of the stock in the old company, continued to own the majority of the stock in plaintiff corporation. A part of plaintiff’s stock was sold in order to get working capital to rebuild the plants of the company and to get back into business.
10. There was very little legal whisky in existence when repeal became effective and there was a mad rush to get back into production. Selling whisky, which has been aged for several years, at premium prices is plaintiff’s special niche in the industry. However, in the early years of its existence plaintiff had little or no four-year-old whisky to sell as quality whisky at premium prices. In these early years, plaintiff, in competition with other and some much larger companies, first sold three-months-old whisky, then a six-months-old product, nine-months and then a year-old product, and stepped up the age scale as older inventories became available for sale. By 1936 or 1937 plaintiff found that in these operations it could not compete profitably on a volume basis with the larger companies and that it was failing to accumulate the necessary inventory of aged quality whisky with which to command premium prices. In 1938 plaintiff dismissed its then executive vice president and appointed a management executive committee consisting of Owsley Brown, his two sons, Lyons and Garvin, and John Sanderlin to direct the active operations of plaintiff. At that time plaintiff commenced to accumulate its whisky distillations until they had matured beyond four years of age, so that it would be in a position to sell quality whisky at premium prices. As a result of accumulating its distillations instead of selling them, plaintiff’s financial condition worsened and it was short of cash. During this period of financial stringency, the lending bankers supervised plaintiff’s expenditures for numerous items such as advertising and required monthly reports. The banks also prohibited distilling of new products for several months and required temporary postponement of payment of part of Owsley Brown’s salary to help build up a cash reserve. The management committee was successful in leading plaintiff out of these difficulties. Profits were earned during the fiscal years 1939 and 1940.
*475 11. Due to financial difficulties, plaintiff was unable to pay its officers what they regarded as adequate compensation. The following table shows the compensation paid to members of the Brown family for the fiscal years indicated:
Owsley Brown:
1936-38_ $26,000.00
1939-40_ 21,260.08
1941_ 26, 000.08
1942_ 30,781.33
W. L. Lyons Brown:
1934_ 2,400.00
1936-36_ 4,800.00
1937_ 6, 612.46
1938_ 6, 799. 92
1939_ 6,120. 00
1940_ 7,736. 70
1941_ 10,000. 09
1942_ 15,208.36
George Garvin Brown:
1934_ 900. 00
1936_ 2,760.00
1936_ 3, 000.00
1937_ 4, 812.45
1938_ 4,999.92
1939_ 4,600.00
1940_ 6, 760.00
1941_ 7,600.00
1942_ 12,781.25
Kobinson S. Brown:
1935_ $2,339.81
1936_ 4,700.00
1937_ 5,000. 00
1938__-_ 4,800.00
1939_,._ 4,320.00
1940_ 4,603.50
1941_ 6,000.23
1942_ 6,775.17
For the same fiscal years as above, all other salaries of officers and key employees, with the exception of the executive vice president who left on May 22, 1939, ranged between a low of $1,800 and a high of $9,853.13.
12. Beginning in the latter part of 1941 there were several discussions about paying higher compensation to plaintiff’s officers and key employees. There was also a discussion of *476 this compensation problem at the meeting of the board of directors held in February 1942. At that time Daniel Lee Street, who was a member of plaintiff’s board of directors and its general counsel, and who was representing other whisky distilleries in the course of his law practice in Louisville, Kentucky, was authorized to make a study concerning compensation plans and to recommend a plan to the board to be effective for the fiscal year beginning May 1, 1942. He secured all the information he could find in Louisville and elsewhere in regard to compensation plans. He checked and determined the compensation which had been paid by Frankfort Distilleries and by other companies in the industry which filed proxy statements disclosing the compensation that was being paid to their top executives. He concluded that a plan calling for a distribution of 10 percent of net profits was fair and reasonable and was in line with what was being paid by companies in Louisville and in other parts of the country. At the regular annual meeting of the board of directors on July 28,1942, this compensation problem was again considered. Mr. Archie P. Cochran, a prominent Louisville business executive, who was a non-company and non-family director of plaintiff, stated that plaintiff’s salaries were extremely low and the management should be paid more, or, if they were not worth more, then the board of directors should hire new officials who could operate the company properly and pay them what they were worth. Mr. Cochran had had experience with an incentive compensation plan while he was employed by the Keynolds Metals Company and he had had experience with a similar incentive plan with the Cochran Foil Company, which he had organized in 1939 or 1940. These incentive plans had been successful for Keynolds Metals Company and Cochran Foil Company. The hoard decided it was inadvisable to increase the fixed compensation of the officers and key employees because it was thought best to keep such compensation relatively low so that the company would not be embarrassed if it had any more poor years.
13. At the July 28,1942, annual meeting, the board of directors adopted the following resolution which had been drafted by Mr. Street approving fixed salaries for its six *477 officers, as well as an incentive compensation plan, and fixing participation percentages therein for its six officers and eight key employees:
Besolved that the following named officers be paid the salaries set opposite their respective names, prorated on a monthly basis and effective as of August 1, 1942.
Owsley Brown, President_$25,000. 00
W. Ii. Lyons Brown, Vice president-- 15,000. 00
Geo. Garvin Brown, Vice president_ 15,000.00
Robinson S. Brown, Secretary_ 7,200.00
John R. Sanderlin, Treasurer_ 8, 400.00
R. W. Moorhead, Jr., Asst, secretary 5,000.00
Mr. Cochran pointed out that the salaries paid to the officers and certain key employees of the Company were not in line with the salaries paid officers and employees in companies of comparable size. He stated that it was his opinion that the Company should put into effect an incentive plan of additional compensation for officers and certain key employees. There was a general discussion in which it was brought out that such plan would operate as an incentive and would undoubtedly result in greater operating efficiency and better results for the Company, and that many companies had adopted a plan whereby 10% of the earnings, after provisions for reserves and payment of all other expenses, was paid as an additional compensation over and above the fixed salaries paid to me officers and certain employees. After full discussion, the following resolutions were introduced, duly seconded and unanimously adopted:
Besolved that as additional compensation for the services rendered by the officers and certain employees hereinafter named, and as an incentive to those officers and employees, there be set aside a fund equal to 10% of the earnings of the Company, after provisions for reserves, except State and Federal taxes on income and profits, and after deducting all other expenses of operations, except this additional compensation, in accordance with the accounting practice of the Company;
Besolved further that such fund be distributed to the following named officers and employees in accordance with the percentage set opposite the name of each such officer and employee.
*478 Percent Owsley Brown_ W. L. Lyons Brown-Geo. Garvin Brown_ John R. Sanderlin-John Lappin_ Frank Shipman_ Gordon Baquie-Geo. R. Wright_ Robinson S. Brown-H. B. McKelvey-Wm. F. Lucas_ J. B. Copenhefer-O. L. Weatherholt-R. W. Moorhead, Jr-C0C0CCC0WO5O5C5 Cafe"»'' CHW©
Resolved further that the foregoing plan shall, m any event, be effective during the fiscal year of the Company ending April 30,1943, but that for the succeeding fiscal years the Board of Directors shall have power and authority to change the plan in any way it sees fit, to change the percentages to be paid to the respective officers and employees, and, if the Board of Directors deems it necessary to do so, to abolish the plan entirely.
14. On the date the incentive plan was adopted and the fixed salaries were determined for the officers and key employees for the fiscal year ended April 30, 1943, Owsley Brown and his sons, Lyons and Garvin, and his brother, Robinson, together with their families, owned about 51 percent of the voting stock of plaintiff. The four named Browns were directors of plaintiff. However, these individuals did not constitute a majority of the board of directors, which was composed of nine individuals. Only one director of the five who were not members of the Brown family owned stock in the plaintiff corporation. He was John Marshall, Jr., who owned only 45 shares of common stock. The directors’ ownership in stock of plaintiff remained substantially the same as above for the fiscal years ended April 30, 1944, 1945 and 1946, which are the years controlled by the compensation resolution passed July 28, 1942.
15. The incentive compensation plan adopted in the resolution of the board of directors on July 28,1942, was effective for the fiscal years 1943 to 1946, inclusive. Thereafter, by resolutions of the board of directors dated April 26, 1946, April 25,1947, May 27,1948, and April 28,1949, the plan was *479 adopted with certain revisions effective for each, of the respective ensuing fiscal years. These revisions reduced the percentage participation of the officers and provided for percentage participation by additional employees who were not officers.
16. On the dates the foregoing resolutions were passed by the board of directors fixing the incentive compensation and salaries for the officers and key employees for the fiscal years ended April 30, 1947, 1948, 1949, and 1950, the ownership of the voting stock of Owsley Brown and his family remained about the same as that shown in finding 14 above. During these years Owsley Brown and members of his family did not constitute a majority of the board of directors. There was a change in the membership and in the stock ownership of the non-family directors. Mr. Marshall no longer owned his 45 shares; Mr. Street acquired 300 shares in 1946 and increased his ownership of plaintiff’s stock each year, and by 1950 he owned 3,000 shares; Mr. Cochran acquired 400 shares in 1948 and continued to own these shares through 1950. In 1947 Saunders P. J ones replaced Wm. H. Labrot and in 1948 Rogers C. B. Morton replaced Thruston B. Morton. In 1948 John B. Lappin was added to the board.
17. The fund made available each fiscal year for payment to officers and key employees under the incentive bonus plan was as follows:

*480 The following is a summary of the percentage of the incentive compensation fund allocated to officers and key employees with respect to whom the Commissioner of Internal Revenue’s disallowance of deductions for compensation relate:

In addition to the above-named officers and employees whose compensation has been disallowed in part, the following number of additional employees, who were not officers, participated with fixed percentages in the incentive compensation fund for the years indicated:

None of the compensation paid this group of employees has been disallowed by the Commissioner.
*481 18. The table below shows the fixed salaries, incentive compensation and total compensation paid to the officers and certain key employees of plaintiff for the fiscal year ended April 80, 1943. The table also shows the amount of compensation allowed by the Commissioner of Internal Revenue and the amount that he disallowed.*

*482 19. The table below shows the fixed salaries, incentive compensation and total compensation paid to the officers and certain key employees of plaintiff for the fiscal year ended April 80, 1944. The table also shows the amount of compensation allowed by the Commissioner of Internal Revenue and the amount that he disallowed.

*483 20. The table below shows the fixed salaries, incentive compensation and total compensation paid to the officers and certain key employees of plaintiff for the fiscal year ended April 30, 1945. The table also shows the amount of compensation allowed by the Commissioner of Internal Revenue and the amount that he disallowed.

*484 21. The table below shows the fixed salaries, incentive compensation and total compensation paid to the officers and certain key employees of plaintiff for the fiscal year ended April 30, 1946. The table also shows the amount of compensation allowed by the Commissioner of Internal Revenue and the amount that he disallowed.

*485 22. The table below shows the fixed salaries, incentive compensation and total compensation paid to the officers and certain key employees of plaintiff for the fiscal year ended April 30, 1947. The table also shows the amount of compensation allowed by the Commissioner of Internal Eevenue and the amount that he disallowed.

*486 23. The table below shows the fixed salaries, incentive compensation and total compensation paid to the officers and certain key employees of plaintiff for the fiscal year ended April 30, 1948. The table also shows the amount of compensation allowed by the Commissioner of Internal Revenue and the amount that he disallowed.

*487 24. The table below shows the fixed salaries, incentive compensation and total compensation paid to the officers and certain key employees of plaintiff for the fiscal year ended April 30, 1949. The table also shows the amount of compensation allowed by the Commissioner of Internal Revenue and the amount that he disallowed.

*488 25. The table below shows the fixed salaries, incentive compensation and total compensation paid to the officers and certain key employees of plaintiff for the fiscal year ended April 80, 1950. The table also shows the amount of compensation allowed by the Commissioner of Internal Revenue and the amount that he disallowed.

26. As a group, the officers and key employees whose compensation is in controversy were an outstanding managerial staff in the distilling industry during the years 1942 to 1950 and their company enjoyed a phenomenal growth, as seen in later findings. The members of the Brown family will be discussed more in detail hereafter. But, in addition to the Browns, plaintiff employed the following individuals whose qualifications are briefly summarized. They were all of outstanding reputation in their specialized fields, were well educated and devoted their full time to plaintiff’s business during the years involved in this proceeding. The successful operation of plaintiff’s business and its continuous advancement can be attributed largely to the combined talents of its management team.
*489 Dr. Frank M. Shipman joined plaintiff as technical director in 1936 in charge of all research development, testing and production controls. Dr. Shipman has a doctor’s degree in chemical engineering and has specialized in distillation factors. He holds a patent arising out of his work with the industry. Dr. Shipman is a member of various professional societies and served the Federal Government in various important capacities in connection with World War II.
Mr. John B. Lappin was employed in 1937, having had long experience as a sales manager with Calvert Distilling Company and with Continental Distillers. In 1940 he was promoted to the position of controller of sales and from 1945 to 1947 was a vice president. He resigned because of ill health in 1947 but remained as a director.
Mr. H. B. McKelvey, who was, also, an experienced distilling company sales manager, followed Mr. Lappin in plaintiff’s employ and in promotions. He was employed by plaintiff in 1938 and resigned in 1946 due to ill health.
Mr. Curtis L. Weatherholt, an experienced traffic manager, was employed in that capacity by plaintiff in 1936. In 1941 he was made credit manager and in 1945 was elevated to assistant treasurer.
Mr. J. Gordon Baquie was hired by plaintiff in 1937 from Seagram Distilling Company and placed in charge of plaintiff’s sales in its home territory. He organized plaintiff’s export sales department in 1939.
Mr. John B. Copenhefer was employed by plaintiff in April 1934 and in 1945 was made assistant secretary, serving in that capacity for the balance of the years involved in this proceeding. An experienced production engineer, Mr. Copenhefer took active charge of plaintiff’s production and bottling.
Mr. William F. Lucas, a mechanical engineer, joined plaintiff in 1935 and became director of engineering and construction work and a vice president in 1945. Plaintiff’s physical facilities were greatly enlarged under his supervision, some seven million dollars being spent for the purpose from 1943 to 1950. Mr. Lucas also supervised a large number of maintenance men.
*490 Mr. J. B. Sanderlin was a statistician with a master’s degree in business administration from Harvard University. He was employed by plaintiff in 1934 as comptroller, in 1941 was made treasurer and was a member of the management committee. He had charge of plaintiff’s accounting, collections, and budget control matters and had as many as 100 employees under his supervision.
Mr. Daniel L. Street, a Louisville, Kentucky, lawyer, served as plaintiff’s legal advisor and was elected a vice president in 1947, after serving, also, as a director since 1936. He has devoted his full time to plaintiff’s affairs as have the others mentioned in this finding and, in addition, has been a member of almost every important company committee.
Mr. Sherman L. Jenney was employed by plaintiff in 1946 as sales manager for the State of New York and was elected a vice president in 1949. He was an experienced distributor.
Mr. Bodman W. Moorhead, Jr., was first employed by plaintiff in 1934 as a clerk in the sales department. He later was advertising manager, advertising director, a vice president and assistant secretary.
Mr. George Wright was employed by the plaintiff in 1940 as sales manager for a then operating subsidiary, The Old Kentucky Distillery. Previously he had been a divisional sales manager with Seagram Distillers. From 1934 to 1945 he was plaintiff’s assistant regional sales manager and in 1945 was made a vice president with headquarters in San Francisco.
27. Mr. Owsley Brown was plaintiff’s president from the date of its incorporation in 1933 to 1945 and chairman of the board of directors from the latter date until July 24, 1951. He died October 31, 1952. He graduated from the University of Virginia Law School in 1902, and practiced law until 1904 when he went into the distillery business with his father. He had been an executive of the plaintiff’s predecessor commencing in 1904 and its president from 1917. During prohibition he was president of the predecessor company which held one of the eight permits issued for the manufacture and sale of whisky under the American Medicinal Spirits Act. Mr. Brown was founder of the trade association of the distilled spirits industry, the Distilled Spirits *491 Institute, and through that organization was responsible for the adoption by the entire industry of voluntary controls with respect to selling and advertising of distillery products^ He was elected the first president of the Distilled Spirits Institute in 1933 and was reelected thereafter for 13 consecutive years until 1945, at which time, because of his age and health, against the protest of the industry, he refused reelection and became chairman of the board of the Institute, remaining in that capacity until the day of his death. He was president of the Kentucky Distillers Association and director of several institutions including the First National Bank of Louisville and the Kentucky Trust Company. He was respected by the entire industry and acted as arbitrator at times between companies when matters were in dispute. Because of his reputation, the bankers respected him to such an extent that plaintiff was able to remain in business during the hard times experienced in the late 1930’s. During the company’s critical financial period commencing in 1938 he was responsible for setting up the management committee, of which he was a member, and which was responsible for adopting and carrying out plans which contributed to the success of the company. From 1917 until 1949, when Owsley Brown’s health began to fail, he was plaintiff’s, and its predecessor’s, chief executive officer, initiating and directing its policies and exercising complete supervision and direction over all operations. Because of ill health in 1948, he became less active in directing plaintiff’s affairs, and at that time he ceased participating in the incentive bonus plan but continued active in an advisory capacity until his death.
28. Mr. W. L. Lyons Brown, a son of Owsley Brown, served as secretary of plaintiff from 1933 to 1939, vice president from 1939 to 1945, and was president thereafter during the years in question. During the company’s critical financial period commencing in 1938, he also served on the management committee, which took over complete operation of the company, and in this capacity was responsible for adopting and carrying out plans which contributed to the success of the company. He was born in Louisville in July 1906, attended the U. S. Naval Academy for about two years and due to a leg injury left the Academy and attended the Uni *492 versity of Virginia for two additional years. From about 1928 to 1932 he was with the largest brokerage firm in the city of Louisville where he became branch manager. In 1932 he left the brokerage business and went into the travel business, having been a cruise director for Mediterranean, round-the-world and North Cape cruises, and was responsible for 300 to 700 passengers. Mr. Lyons Brown came with plaintiff’s predecessor in August 1933 and did some construction work with the company at that time. Upon formation of the Delaware corporation he was made secretary and director. He was also advertising director. He was elected vice president of the company in 1939 at which time he also took on additional duties as sales manager for the company, his title being sales and advertising director. The activities of regional sales offices in New York, Chicago, and San Francisco were under his supervision. During the period involved, Lyons Brown was also chairman of the executive committee of the company. As vice president he was director of the entire sales and advertising organizations, his duties being primarily to see that the operations were made within budget limitations from cost, advertising, and selling expense angles. Under his supervision plaintiff’s net sales increased from approximately $11,200,000 in 1942 to $45,-700,000 in 1950. Both as vice president and president he was in charge of frequently held management conferences which formulated plaintiff’s over-all business policies. Advertising expenditures under his supervision increased from about $539,000 in 1942 to about $3,408,000 in 1950. The activities of approximately 100 to 125 men in the sales organization were under his supervision. His duties as director of the sales organization required a considerable amount of travel and on many occasions he was on trips for as long as two and three weeks at a time. After he became president he initiated and directed plaintiff’s policies and had general supervision of all operations. He has a reputation as one of the top executives in the distillery industry and devotes his entire time to the affairs of the business.
29. Mr. George Garvin Brown has successively been assistant secretary and purchasing agent, production manager, vice president in charge of production, and executive vice *493 president of plaintiff between 1933 and 1950. He also served on the management committee during the critical financial period beginning in 1938 and was responsible for adopting and carrying out policies which contributed to the success of the company. He is the son of Owsley Brown and was born near Louisville in February 1912. He attended preparatory school in Kentucky and completed his education at the University of Virginia in the School of Business. Prior to his employment by plaintiff in August 1933, he was an assistant cruise director with a subsidiary of the Dollar Steam Ship Line in which capacity he made a round-the-world cruise and two Mediterranean cruises, in between which he sold cruises for subsequent trips. When he came with plaintiff in August 1933 the company was still in the process of rebuilding its distillery and he started out as a labor foreman. Upon the formation of the Delaware corporation in November 1933, he was elected a director and assistant secretary at which time he also served as purchasing agent. In the fall of 1934, when the then production manager left the company, he became production manager. He was elected vice president in 1938 and in 1945 became executive vice president. As production manager he was in complete charge of all production including the manufacture and warehousing of whisky, the bottling of whisky and the procurement of supplies, such as grains, barrels, etc., needed in the production process. During the period 1942 to 1945 plaintiff’s plant was in production under his supervision on a 24-hour, 7-day week schedule producing alcohol for the Government. In addition, this created a problem of supplying enough merchandise to sell during the war period, and resulted in the necessity of bartering and exchanging with other members of the industry various raw materials required in production of distilled spirits. He was also in charge of construction work. Under his supervision the capacity of plaintiff’s plants at the end of the war was approximately double what it had been prior thereto. The cooperage, or making of barrels, which was most important in the distillery process, was also under his supervision in connection with which, at various times, as many as 16 mills were in operation located in various parts of Ohio, West Virginia, Kentucky, North Carolina, *494 Tennessee, Indiana and other localities. Employees engaged in the production process for the years involved in this proceeding varied from about 500 to slightly over 1,000. Mr. George Garvin Brown was also the senior officer in charge of labor relations for the company. Among the various unions in the company are the Distillery Union, Firemen and Oilers Union, Electricians Union, Cooperage Union, as well as several others, all of which are affiliates of the American Federation of Labor. Also during this period the CIO was represented in a plant operated in Pennsylvania. With the exception of a two-week period in 1949 when the company itself closed down its plant as the result of a dispute with the union, the company has had no labor difficulties. Unions have been represented in the company since 1940, during which time there have been no walk-outs or strikes. Mr. George Garvin Brown is a director of the First National Bank as well as the Kentucky Trust Company, both of Louisville. In addition to his other duties as executive vice president, he has participated in the formulation of plaintiff’s over-all business policies and he serves on its executive committee. He enjoys an excellent reputation as an executive in the distillery industry and during the years involved in this proceeding his entire time was devoted to his employment with plaintiff.
30. Mr. Bobinson S. Brown, brother of Owsley Brown, came to plaintiff in 1934 from a post with the First National Bank of Louisville. He was first treasurer of plaintiff and later became secretary. He has been a director of plaintiff at all times herein involved. Mr. Brown was a vice president of plaintiff’s predecessor company and a director. In addition to his normal corporate duties he also supervised the placement and enforcement of all insurance for plaintiff. Because of the large inventory and shifting value thereof due to the constant change in the maturity dates of the stored whiskies, the insurance coverage created many problems. He also supervised coverage of employees by insurance as well as the company’s welfare plan and participated in formulation of plaintiff’s business policies.
31. Following the adoption of the incentive compensation plan, plaintiff began to show a rapid growth. Net sales in *495 1942 amounted to about $11,200,000. By 1950- sales had increased to more than $45,700,000, an increase of about 300 percent. Net profits before deducting income taxes but after deducting all compensation payments had increased from $668,000 in 1942 to $5,621,000 in 1950, an increase of about 740 percent. The earnings on the common stock had increased from 47 cents per share in 1942 to $4.64 in 1950, an increase of nearly 900 percent. The book value of the common stock in 1942 was $7.12 per share, and by 1950 the value had increased to $68.72 per share, an increase of also nearly 900 percent. Plaintiff’s common stock was actively traded on the American Stock Exchange, and the market value of the stock increased by about 60 times from a low of about $1.25 per share. Dividends paid in 1942 amounted to $30,000. By 1950 they had increased to $981,735, an increase of over 3,170 percent. Total assets for 1942 were $9,135,000. In 1950 they were $41,805,000, an increase of over 350 percent. Working capital had increased from $2,490,000 in 1942 to $25,795,000 in 1950, an increase of over 900 percent. Employees of 535 in 1942 had increased to 1,038 in 1950, an increase of about 100 percent. There were also substantial increases in plaintiff’s capacity during this period of 1942-1950. Warehouse storage capacity of 205,627 barrels in 1942 had increased to 465,871 barrels by 1950, an increase of over 125 percent. Distilling capacity increased from 5,480 bushels per day to 7,400 ¡bushels per day, an increase of about 35 percent. The bottling capacity was increased from 7,500 cases per day in 1942 to 15,000 cases per day in 1950, an increase of 100 percent. Prior to 1946 all of plaintiff’s requirements for cooperage were purchased from outside sources. In 1945 plaintiff installed its cooperage facilities. By January 1946 the plant was in operation and was producing about 1,200 barrels per day, which was sufficient to supply plaintiff’s requirements and, in part, the requirements of other distillers.
32. The table below compares plaintiff’s net sales, net income and net worth with the total compensation paid its officers and employees whose compensation is in dispute for the years involved in this proceeding:

*496

33. Plaintiff’s aggregate dividend payments on its preferred and common stock during the fiscal years 1940 to 1950, inclusive, are as follows:
1940_ 00
1941_$22, 500
1942 _ 30,000
1943_ 30, 000
1944,__ 74,231
1945 _ 99,90S
1946 _313,279
1947_ 471,356
1948_ 863,940
1949 _ 981, 735 1950_ 981, 735
34. Plaintiff’s capital stock is listed on the American Stock Exchange, New York City, formerly known as the New York Curb Exchange. As required by the Securities Exchange Act of 1934, plaintiff filed with the Securities and Exchange Commission, Washington, D. C., annual reports with respect to the years herein involved which set forth the details of the incentive compensation plan, including the participants and the amount of their fixed and incentive compensation. These reports are public information and are required under the provisions of the above act for the protection of investors. Similar reports were also made to the American Stock Exchange. Plaintiff’s listed shares are actively traded. No complaint or criticism by stockholders of the compensation paid to its officers or employees has been called to the attention of plaintiff’s management nor was it put in evidence at the trial of this claim.
*497 35. The high and low listings of plaintiff’s common stock for the years 1940 to 1950, inclusive, on the American Stock Exchange, were as follows:

The high and low listings of plaintiff’s $10 par 4 percent junior preferred stock for the years 1948 to 1950, inclusive, on the American Stock Exchange, were as follows:

Plaintiff’s earnings per share of common stock for the years 1942 to 1950, inclusive, were as follows:

36. On April 30,1942, plaintiff had outstanding notes with banks in the amount of $3,884,310 and on April 30, 1951, the notes outstanding with banks and insurance companies totaled $17,200,000. Plaintiff’s borrowings were from banks and insurance companies, and these companies were furnished financial statements from time to time which disclosed plaintiff’s compensation plan. There is no evidence *498 of any objections by these creditors to the compensation paid by plaintiff to its officers and employees.
37. On the date that plaintiff adopted its incentive plan, and for many years prior thereto, the regulations of the Bureau of Internal Bevenue in respect to contingent compensation read as follows:
The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid (Beg. Ill, Sec. 29.23 (a)-6.(2)).
38. On October 2,1942, the President approved the Stabilization Act of 1942 authorizing him to promulgate regulations controlling wages and salaries. On October 3,1942, the President, by Executive Order 9250, established the Office of Economic Stabilization, the director of which, on October 27, 1942, pursuant to authority granted him by the President, issued a regulation under which the Commissioner of Internal Bevenue was designated as the official having authority to determine whether salaries received by designated employees violated the law. The Commissioner established the Salary Stabilization Unit to which plaintiff on November 17,1943, submitted an application reading in part as follows:
Brown-Forman Distillers Corporation * * * applies to you for approval of a contractual compensation plan under the applicable rules and regulations of the Bureau of Internal Bevenue with respect to salary stabilization. The compensation contract was entered into between Brown-Forman and fourteen of its officers and executives prior to October 1942. * * *
*499 The application set forth the plan and stated the amounts payable to plaintiff’s officers and key employees for the fiscal year ended April 30, 1943, and an estimated amount which would be payable for the fiscal year ended April 30, 1944.
39. Plaintiff’s incentive compensation plan was permitted to continue in effect by the Commissioner of Internal Revenue under T. D. 5406 which reads in part as follows:
Where an employer had, prior to October 3,1942, customarily paid a salary or salaries on a fixed percentage basis, or had entered into a contractual agreement prior to that date, to pay a salary or salaries on a fixed percentage basis, such employer may continue to pay without the approval of the Commissioner of Internal Revenue such salary or salaries determined in accordance with such custom or agreement, provided no change has been made in the percentage or method of determining the amount payable.
Salary stabilization was in effect until repealed by Executive Order 9801 on November 9,1946. During this period plaintiff made no changes in its incentive compensation plan.
40. By reason of war conditions the distillation of beverage alcohol was prohibited by Government order on and after October 8, 1942, and had been limited for some time prior thereto. All distillers were urged to manufacture as much munition and industrial alcohol as possible. Plaintiff converted its entire production facilities to such purposes and that continued to be its principal product until 1945. Plaintiff, of course, continued to sell whisky from its existing inventory but allocated it over a longer period of time than previously. Between 1942 and 1945 plaintiff doubled its plant capacity by the construction of emergency facilities with the United States Government taking over almost its entire output for war uses. The profit on alcohol was much less than plaintiff’s prior and subsequent profit on whisky distillation. Between 1946 and 1950 the increasing uncontrolled selling prices of the limited supplies of older whiskies then available operated to provide great profits to distillers.
41. Revenue agent D. K. Coen made a complete tax audit of plaintiff’s books for the fiscal years ended April 30,1943, 1944, and 1945 and recommended the disallowance as deductions to plaintiff under section 23 (a) (1) of the 1939 Inter *500 nal Bevenue Code of parts of the total compensation paid by plaintiff to Owsley Brown and his sons, Lyons and Gar-vin, as shown in the following table:

42. The agent’s report, dated July 21, 1946, included the resolution of July 28,1942, summarized the services rendered by the officers and employees in question, quoted section 23 (a) (1) (A) of the Internal Bevenue Code that there shall be allowed as a deduction, “All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered,” and concluded that, “In the circumstances the deductions claimed for compensation of officers and certain hey employees of the taxpayer appear to exceed reasonable allowances therefor.”
The conclusions and opinions of agent D. K. Coen upon which he made the determination indicated may be summarized as follows: (1) No dividend had been paid at any time on plaintiff’s common stock to any of its approximate 700 common stockholders until April 30,1945; (2) dividends on plaintiff’s cumulative preferred stock on April 30,1943, were overdue in the total amount of $26 per share, or 17ys quarterly dividends and the arrearages totaled $390,000; (3) Owsley Brown effectively controlled plaintiff and its board of directors; (4) the age, experience, training, and earning capacity of Lyons and Garvin Brown did not warrant the extravagant compensation paid them by plaintiff in the years involved; (5) plaintiff had the services of remarkably capable men to conduct its affairs in Dr. Frank Shipman as over-all technical director, William F. Lucas on construction and maintenance activities, John B. Copenhefer as effi *501 ciency engineer on bottling operations, John R. Sanderlin on finances and taxation, and John B. Lappin in charge of sales operations; (6) war conditions had greatly enhanced the values of plaintiff’s inventories and plaintiff had no selling problems; (7) the compensation paid to such able employees compared unfavorably with that paid to Owsley, Lyons and Garvin Brown; (8) a comparison of plaintiff’s capitalization, sales, aggregate compensation of officers, dividends, etc., with the competing company organized and operated most nearly like the plaintiff (Glenmore Distilleries Company of Louisville, Kentucky) disclosed that plaintiff paid substantially higher total compensation to its executive officers than Glenmore, and plaintiff paid dividends far lower percentagewise to its capital, sales, and income than Glen-more.
43. Agent Coen’s disallowances of deductions to plaintiff for reasonable compensation paid for services actually rendered were concerned solely with amounts paid to Owsley, Lyons and Garvin Brown. The agent’s adjustments were approved and adopted by the Commissioner of Internal Revenue. Agent Coen was an experienced revenue agent who had audited the books of other distillery companies in Louisville. He did not represent himself at the trial as an expert as to what should be the compensation of officers and key employees of a company engaged in distilling whisky. The agent’s determination of allowable deductible compensation paid by plaintiff to the three Browns was as follows:

44. Under its fixed salary and contingent compensation plan for the years 1943,1944, and 1945, plaintiff paid aggregate amounts to its 14 officers and key employees and claimed deductions under section 23 (a) (1) of the 1939 Internal Revenue Code therefor as follows:

*502

45. Plaintiff’s income and excess profits tax returns for the fiscal years ended April 30,1946 to April 30,1950, inclusive, were audited by revenue agent C. C. Parks. These audits were included in two reports, a report dated December 20, 1949, covering the fiscal years 1946, 1947, and 1948, and a report dated June 4,1951, covering the fiscal years 1949 and 1950. In these reports, revenue agent Parks made a lump sum allowance of $600,000 a year for the same officers and key employees who had been included in revenue agent Coen’s report. The table below sets forth the total adjustments made in the two reports prepared by revenue agent Parks. These adjustments are given in more detail in findings 21 to 25.

In the first report prepared by revenue agent Parks he referred to the report which revenue agent Coen had made for the years 1943,1944, and 1945 and then stated:
The deductions claimed for compensation of officers and key employees appear to exceed a reasonable allowance. In the light of available facts it is held that reasonable compensation for the officers of the company for the years under examination is $600,000 per annum.
In revenue agent Parks’ second report, after again referring to revenue agent Coen’s report and his own previous report, he stated:
* * * It appears that reasonable compensation of officers for the years under examination should not exceed *503 the deduction allowed during F-1946 — F-1948 inclusive. It is beld that $600,000.00 represents reasonable compensation of the officers of this taxpayer for the years ending April 30, 1949, and April 30, 1950.
46. The Commissioner of Internal Revenue approved and adopted the recommendations made by revenue agent Parks as he did those of agent Coen. The determination of agent Parks, as in the case of agent Coen, regarding the allowable compensation for the officers and key employees for the years that he audited, was an expression of his opinion as to what was reasonable but he did not hold himself out as an expert capable and qualified to express an opinion as to what was reasonable compensation to be paid executives and key employees of a company engaged in distilling whisky.
47. Revenue agents Coen and Parks selected the Glenmore Distilleries of Louisville, Kentucky, as a business comparable to plaintiff, and they used that company in determining compensation which in their opinion should be allowed as deductions for purposes of plaintiff’s income and excess profits tax returns for the years 1943 to 1950, inclusive. Plaintiff and Glenmore, beginning with 1934 and thereafter, were engaged substantially in the same business. “Kentucky Tavern,” “Glenmore,” and “Old Thompson” were the principal brands used by Glenmore in selling its whiskies, as compared with the brand names of “Old Forester,” “Early Times,” and “King” used by plaintiff. The companies during the years involved in this proceeding had about the same capitalization and capacities. The table below shows a comparison of the compensation paid to the officers of these two companies:

*504 Plaintiff has a fiscal year ended April 30 while Glenmore has a calendar year for its accounting period. Plaintiff’s figures above start with April 30,1943 and end with April 30, 1950. Glenmore’s figures start with the calendar year 1942 and end with the calendar year 1949. In order to continue the comparison which starts with 1943, the entire table assumes that “key employees” were not made officers in later years.
The foregoing comparison shows that in each year plaintiff’s fixed salary payments to officers were less than the fixed salary payments made by Glenmore to its officers, and that in each year plaintiff’s bonus payments exceeded those made by Glenmore. The table below shows a comparison of (a) net sales, (b) profits, and (c) percent of profits to net sales for plaintiff and Glenmore for the years 1943 to 1950, inclusive:

48. During the eight-year period 1943-1950 plaintiff’s profits, after deducting all compensation, exceeded those of the Glenmore Company by about $14,000,000. Mr. Joseph A. Engelhard, president of Glenmore, expressed the following opinion in regard to plaintiff’s incentive bonus plan:
1. In his opinion a compensation plan which provides that the officers and key employees shall participate in a certain percentage of the profits of the corporation, similar to the plan of Brown-Forman Distillers Cor *505 poration, would be reasonable and wise for Glenmore Distilleries Company.
2. If such a plan bad been in effect for Glenmore during the years 1943-1950, he is of the opinion that it would have been beneficial to the Glenmore Company.
3. In his opinion the fixed and incentive compensation paid to the officers and key employees of Brown-Forman during the years 1943 to 1950, inclusive, was reasonable.
49. The plaintiff corporation is and has been controlled by the Brown family since the date of its original organization in 1870. When the compensation of executives and key employees was annually fixed for the years here in question, the initial decision thereon was made each time by the members of the Brown family who were the principal beneficiaries so far as compensation from the company was concerned. However, this initial decision was formally ratified each year by the board of directors composed of the Browns and others, as hereinbefore noted.
Considering all of the facts including the apparent satisfaction of stockholders with progress of the company, its sales, its profits and the services rendered by the officers and key employees in successful leadership of the enterprise, the profits of which from 1943 to 1950, after deducting all compensation, exceeded those of its nearest competitor by $14,000,000, it is found that the total compensation which the officers and key employees received as set forth in findings 18 to 25, inclusive, was not in excess of a reasonable allowance as compensation for personal services rendered by them and constitutes an ordinary and necessary business expense which plaintiff is entitled to deduct under section 23(a) of the Internal Bevenue Code.
50. In 1948 the plaintiff owned in fee both sides of Howard Street between 18th and 29 th Streets in Louisville, Kentucky. While the title to the land was plaintiff’s the use thereof had been permanently dedicated to the city. The plaintiff in 1948 undertook to have the street formally and permanently closed by the city in order that plaintiff might have the land for exclusive use as a refinery parking and shipping area. The Board of Aldermen passed the necessary resolution and the city attorney was thereupon required to file suit and dispose of the other formalities. The city attorney took the *506 position that, in addition to making plaintiff a defendant in such action, certain other parties whose property did not immediately adjoin Howard Street should also be made defendants in the action. Plaintiff did not agree with this view but, in order to accomplish the closing of the street without additional delay, plaintiff persuaded the other parties to employ an attorney to represent them. Plaintiff paid this attorney $7,500 and it is understood that a part of this payment was probably distributed to the property owners to gain their cooperation. In addition, $500 was paid to the city of Louisville which represents the fee required by the city in connection with the closing of the street. The sum of $2,000 was paid to LeKoy Highbaugh, who was one of the property owners whose property did not adjoin Howard Street. For this latter payment plaintiff did not receive any title to any property owned by Highbaugh. When plaintiff, as a result of these actions and expenditure of $10,000, obtained the closing of the street, it was then fenced off as a part of its premises. There was no compulsion on plaintiff to pay any of the amounts referred to and such payments were made voluntarily.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is entitled to recover.
Entry of judgment Is suspended pending the filing of a stipulation by the parties showing the amount due plaintiff in accordance with this opinion.
In this case, on August 17, 1955, in accordance with the opinion of the court and on a stipulation by the parties showing the amounts due thereunder, judgment was entered as follows:
ORDER
This case comes before the court on a stipulation of the parties filed August 16, 1955, signed on behalf of the plaintiff by the attorney of record and on behalf of the defendant by Assistant Attorney General H. Brian Holland, in which it is stated that based on the opinion of the court in the case dated July 12, 1955, the amount of *507 the judgment to be entered in favor of the plaintiff are the following amounts of overpayments of taxes and deficiency interest, with interest on each aggregate amount as provided by law:

It is further stipulated that income tax deficiencies of $1,285.70 and $3,367.67 for the fiscal years ended April 30,1944 and 1945, respectively, with interest as provided by law, may be offset against the overpayment of excess profits taxes and deficiency interest for such fiscal years.
Now, therbeoee, it is ORDERED this seventeenth day of August 1955, that judgment be and the same is ordered in favor of the plaintiff in the amounts as set forth above with interest as provided by law less the amounts of the offsets with interest as provided by law.
By the Court.
Benjamin H. Littleton,

Acting Ohief Judge.

 “See. 29.23(a) — 6. Compensation for Personal Services. — Among the ordinary and necessary expenses paid or incurred in carrying on any trade or business may be included a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact pay *465 ments purely for services. This test and its practical application may be further stated and illustrated as follows : * * *
“(2) The form or method of fixing compensation is not decisive as to de-ductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.”

The first three columns in this table, as well as those in the tables appearing under findings 19 to 25, inclusive, have been compiled from exhibit A attached to the petition, the correctness of which is admitted by the answer, ¶ 7-7. The last two columns in the tables have been compiled from the revenue agent's tabulation, exhibit 24. An error of two cents ($0.02) appearing in the agent's tabulation for 1943 has been corrected.